1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4   HIGHSTEPPIN' PRODUCTIONS, LLC,      )
                        Plaintiff,      )
5                                       )
                                        )
6   vs.                                 )  CA No. 09-12208-NMG
                                        )
7                                       )
    GEORGE PORTER, JR., et al,          )
8                       Defendants.     )

9

10  BEFORE:  THE HONORABLE NATHANIEL M. GORTON

11

12                      HEARING ON MOTIONS

13

14

15          John Joseph Moakley United States Courthouse
                        Courtroom No. 4
16                      One Courthouse Way
                       Boston, MA 02210
17                 Tuesday, April 20, 2010
                         11:17 a.m.

18

19

20
                 Cheryl Dahlstrom, RMR, CRR
21                  Official Court Reporter
          John Joseph Moakley United States Courthouse
22            One Courthouse Way, Room 3209
                    Boston, MA 02210
23        Mechanical Steno - Transcript by Computer

24

25

1    APPEARANCES:

2        BAKER & ASSOCIATES
         By:  Jeffrey S. Baker, Esq.
3        Two West Hill Place
         Boston, Massachusetts 02114
4        - and -
         LAW OFFICE OF DAVID A. HERLIHY
5        By:  David A. Herlihy, Esq.
         14 Staniford Street
6        Newton, Massachusetts 02466
         On behalf of the Plaintiff.
7
         JOHN PIEKSEN & ASSOCIATES, LLC
8        By:  John O. Pieksen, Jr., Esq.
         829 Baronne Street
9        New Orleans, Louisiana 70113
         On behalf of the Defendant George Porter, Jr.
10
         THE PENTON LAW FIRM
11       By:  Ronnie Glynn Penton, Esq.
         209 Hoppen Place
12       Bogalusa, Louisiana 70427
         On behalf of the Defendant Porter Batiste Stoltz, LLC.
13
         GREENBERG TRAURIG LLP
14       By:  Eric M. Gold, Esq.
         One International Place
15       Boston, Massachusetts 02110
         On behalf of the Defendant Live Nation, Inc.
16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2      THE CLERK:  This is Civil Action 09-12208,

3      Highsteppin' Productions vs. Porter, et al.  Will counsel

4      please identify themselves.

5      MR. PENTON:  Ronnie Penton on behalf of the PBS

6      defendants.  My daughter, the young lawyer in the room, Mary

7      Ellen Penton, assisting me, Judge.

8      THE COURT:  Mr. Penton, Miss Penton.

9      MR. PIEKSEN:  Good morning, Judge Gorton.  John

11:17 10   Pieksen on behalf of George Porter, Jr.

11      THE COURT:  Mr. Penton, you don't represent Mr.

12      Porter?

13      MR. PENTON:  I represent Mr. Batiste, Mr. Stoltz and

14      PBS, Judge.

15      THE COURT:  But not Mr. Porter?

16      MR. PENTON:  That's correct.

17      MR. BAKER:  Judge, good morning.  My name is Jeffrey

18      Baker.  I'm here on behalf of the plaintiff, Highsteppin'

19      Productions.  To my immediate right is Attorney David Herlihy.

11:18 20   THE COURT:  Mr. Herlihy, you represent the plaintiffs

21      as well?

22      MR. HERLIHY:  I'm in-house counsel.

23      THE COURT:  Do you have an appearance in on this case?

24      MR. HERLIHY:  No, I do not.

25      THE COURT:  I would like you to put an appearance in

1   before you leave today, Mr. Herlihy.  Thank you.  You may be

2   seated, counsel.

3           MR. GOLD:  Your Honor, Eric Gold, from Greenberg

4   Traurig, on behalf of the reach-and-apply defendant, Live

5   Nation.

6           THE COURT:  Mr. Gold.

7           MR. GOLD:  Your Honor, if I can skip ahead a little

8   bit, we had filed a motion to dismiss, and plaintiff's counsel

9   let us know today that they will be assenting to that motion.

11:18 10   So that I think that my appearance is no longer required.

11          THE COURT:  All right.  Is that true, Mr. Baker?  You

12   assent to the dismissal of Live Nation as a reach-and-apply

13   defendant?

14          MR. BAKER:  That is correct, your Honor.

15          THE COURT:  All right.  Then you can be excused, Mr.

16   Gold.  I will allow that motion, it being assented to.

17          MR. GOLD:  Thank you very much, your Honor.

18          THE COURT:  All right.  Counsel, we have multiple

19   motions at issue here.  And what I'm going to do is to announce

11:19 20   to you my strong inclinations, having considered the rather

21   lengthy -- in fact, over-lengthy briefs in the case of the

22   motions to dismiss for lack of jurisdiction and/or for transfer

23   of venue and with respect to -- one of the issues now, of

24   course, has just gone away, and that is, to dismiss the

25   reach-and-apply defendant, Live Nation.  But there is also a

1   motion for contempt for failure to comply with the preliminary

2   injunction that was entered last January.

3          First, let me say that my initial reading of the

4   motion with respect to the defendants dismissing for lack of

5   jurisdiction is going to be denied.  I believe there is

6   sufficient evidence to indicate that the individual defendants

7   have appeared in Massachusetts sufficient to convey

8   jurisdiction on this district.  Obviously, when we get to the

9   motion to transfer venue, it is a discretionary decision.

11:20 10   There is going to be inconvenience with respect to somebody,

11   either the plaintiff appearing in Louisiana or the defendants

12   appearing here in Massachusetts.

13          It seems to me that the plaintiffs have made a strong

14   argument that their choice of forum should be respected.  There

15   is no reason that jumps out to this Court as to why I should

16   transfer this case to Louisiana or that I don't have

17   jurisdiction.  So I am going to allow, in a moment, the

18   defendants to have a few minutes to try to dissuade me from

19   that ruling, that is, my strong inclination at this stage.

11:21 20          With respect to the contempt, it does seem to me that

21   the defendants acted contemptuously to my injunction, at least

22   until the responses that have come in after the filing of the

23   motion, which tell me that for the last two-and-a-half months

24   the defendants have been faithfully trying to get together the

25   information that is necessary to comply with that injunction

1    and have, in fact, put aside at least 20 percent of the

2    receipts.

3        I don't recall any time saying in my injunction that

4    the defendants were required only to put aside 20 percent of

5    their receipts.  But, nevertheless, that's what apparently they

6    have done on the assumption, I suppose, that that's what you

7    were required to do under the agreement with the plaintiff, the

8    principal of which is this Mr. Stepanian, an artist management

9    company.

11:22 10        But the entry of the preliminary injunction was not

11    simply to get us back onto the track of what was required under

12    that agreement.  It was to have something available in case the

13    plaintiff wins on the merits their claim that they're owed

14    somewhere up around a half a million dollars.  So I'm not sure

15    on what grounds the defendants believe they are not in contempt

16    of this court by simply putting 20 percent of the proceeds that

17    they've received since January 1st in an account to be held by

18    the defendants' lawyers in Louisiana, which was authorized.  So

19    I am waiting for an explanation as to why I should not hold the

11:22 20    defendants in contempt in that regard.

21        The only other remaining outstanding motion that I'm

22    aware of is the plaintiff's motion to impound or to seal, which

23    is entirely without detail, and I have no idea what it is that

24    the defendant -- rather, that the plaintiff wants me to

25    impound.  So I'm not inclined to allow that motion unless and

1   until I am convinced that there is something that needs to be

2   impounded or sealed.  So I am inclined to deny that motion of

3   the plaintiff's.

4           As I've said before, the fourth motion is now moot

5   because Live Nation has been dismissed from this case.

6           I received just this morning apparently another motion

7   for entry of a default against the Defendant Funky Meters,

8   Inc., which I am not prepared to rule on.  It obviously hasn't

9   even been responded to by the defendants, and I am not --

11:24 10   apparently am not conversant with the relationship between the

11   individual defendants and the corporate reach-and-apply

12   defendant, Funky Meters, Inc.  I surmise that there is some

13   relationship because it sounds as though Mr. Porter has an

14   ownership interest in that Funky Meters, Inc., but I don't know

15   what the corporate relationship is and, therefore, am not

16   prepared to go forward with resolving that issue.

17           But I'm going to hear briefly from either Mr. Pieksen

18   or Mr. Penton now with respect to the defendants' motion to

19   dismiss this cause of action for lack of jurisdiction and/or

11:24 20   transfer of venue.  Who's going to be speaking for the

21   defendant?  Mr. Pieksen?

22           MR. PIEKSEN:  I will, sir, yes, Pieksen.

23           THE COURT:  Okay.

24           MR. PIEKSEN:  Judge, for efficiency sake, I'm assuming

25   you want to hear strictly about transfer.  Or should I try and

1    dissuade you on personal jurisdiction?

2         THE COURT:  I told you where I stand, and I'm not

3    going to give you a whole lot of time.  I'm going to give you

4    ten minutes right now to --

5         MR. PIEKSEN:  Okay.  Let me hit the transfer first,

6    then.  Obviously, the standard is about three prongs.  It's the

7    convenience of the witness, trial efficiency, financial

8    positions of the parties.  The first thing that we would

9    indicate is that -- and this may play into a number of aspects

11:25 10   of our motion.  But it is very clear that the defendants

11   specifically rejected a forum selection clause.

12        We're aware that the opposition semantically

13   re-categorizes that, but it was an arbitration clause in

14   Boston.  And that was negated and taken out of the contract.  I

15   think that goes a long way towards establishing the intent of

16   the defendants, the foreseeability, whether they expected to

17   be, you know, hauled or hailed into court in Massachusetts.

18        THE COURT:  That has to do with jurisdiction rather

19   than venue, doesn't it, Mr. Pieksen?

11:26 20   MR. PIEKSEN:  I think it goes towards both,

21   predominately jurisdiction, but I think there is some overlap

22   to venue as well.  It certainly indicates that this issue came

23   up and was addressed in contract formation, which would tie

24   into convenience of witnesses and perhaps some of the other

25   issues on the transfer of the 1404, which is why I bring it up.

1          Moving on to the witnesses --

2          THE COURT:  But the agreement between the parties does

3    talk about Massachusetts law applying, does it not?

4          MR. PIEKSEN:  Yes, it does, sir.  No question that

5    Massachusetts law applies, but I think it's a long way from

6    Massachusetts law applies to Massachusetts law will be applied

7    in Massachusetts, especially under federal diversity.

8          As far as the element of the convenience of the

9    witnesses, I mean, we briefed it, you know.  There's not a

11:27 10   whole lot more to add to that except to amplify that while both

11   sides have submitted documentation to your Honor of voluminous

12   witnesses who may be called in this case, what's really

13   relevant is the witnesses who can talk about contract

14   formation, contract performance, and contract breach.

15         I believe from the plaintiffs you'll see an affidavit

16   stating that there are about 80 witnesses, 20 of whom are

17   identified in the pleadings, and all of whom appear to be

18   vendors or other sort of ancillary players, shall we say, in

19   this arrangement.  They will not be able to testify as to

11:27 20   contract formation.  They will not be able to testify as to the

21   defendants' activities, especially the defendants' activities

22   in Massachusetts if -- you know, if that issue is still open in

23   your mind.

24         So, you know, the witnesses who will be involved on a

25   level would be all three individual defendants, their wives or

1   partners who were available and present during some of the

2   meetings in Louisiana.  And just to give you, again, the real

3   quick background, these defendants did not seek out

4   Highsteppin'.  Highsteppin' came to them.  January 18, 2005,

5   email from Highsteppin's principal to Mr. Porter soliciting --

6   essentially asking for a meeting to discuss merchandising.

7        And if you notice, when -- if you hadn't had a chance

8   to look at that email in depth, it talks about an

9   artist-controlled environment.  That's key because while that

11:28 10   was discussed, that's not what transpired here.  What basically

11   transpired -- it got flipped on its head.

12        The reason I bring that up is you see an email talking

13   about artist-controlled environment setting up a situation for

14   the arrangement that was not carried out.  That

15   artist-controlled environment was key to the defendants.  And

16   so, you know, those witnesses who can talk about all of that,

17   they're all in Louisiana.  You have the three individual

18   defendants.  You have their wives.  You have perhaps one or two

19   other individuals who were active with Mr. Eveline, who was the

11:29 20   attorney down in Louisiana, who were actively involved at that

21   stage.

22        Countered against that, you have the plaintiff with

23   one principal and the plaintiff's in-house counsel.  The rest

24   of the witnesses on both sides, quite frankly, are minor.  And

25   I will say in this analysis, they really don't factor in.  So

1      the convenience of the witnesses, I would argue --

2           THE COURT:  Let me change the subject just a minute.

3      Apparently, there's a fact contest as to where the contract was

4      actually executed.  You say it was executed in Louisiana.  The

5      plaintiffs say it was executed in Massachusetts.  What evidence

6      do you have in support of your claim?

7           MR. PIEKSEN:  Sure.  If I could, your Honor, I think,

8      more specifically, the contract states that it was entered into

9      in Massachusetts.  I'm not sure whether the plaintiffs have

11:30 10   actually factually averred that it was signed anywhere other

11     than New Orleans.

12          THE COURT:  That's a start.  Why did your client sign

13     if they didn't believe that it was actually entered into in

14     Massachusetts when it says in black and white that it was?

15          MR. PIEKSEN:  It's a good question.  I'll tell you my

16     clients are much better musicians than they are lawyers.

17          THE COURT:  They didn't have legal counsel when they

18     were executing this agreement?

19          MR. PIEKSEN:  They had counsel, your Honor.  They had

11:30 20   counsel.

21          THE COURT:  So I can't blame them for their lack of

22     knowledge of the law.

23          MR. PIEKSEN:  I wouldn't ask you to do that.  I would

24     ask you to take it into consideration, the relative

25     sophistication legally of the parties.

1          What I would indicate to you is that even if

2     Massachusetts law applies that still doesn't necessarily

3     mandate venue and jurisdiction in Massachusetts.

4          THE COURT:  I understand that.  But the phrase that

5     we're dealing with now is -- in the contract it says the

6     contract was "executed" in Massachusetts.

7          MR. PIEKSEN:  I think -- with all due respect, I think

8     it says "entered into."

9          THE COURT:  All right, "entered into."  Fair enough.

11:31 10          MR. PIEKSEN:  That's in the contract.  The language is

11    there.  The language is factually inaccurate, albeit in the

12    contract.  Mr. Stepanian, I guess, had first met Mr. Porter

13    and, I believe, Mr. Stoltz in Florida.  Then he came to New

14    Orleans.  They met at Mr. Porter's house.  There was some

15    discussion.  And the contract, the agreement, was actually

16    signed in New Orleans during Jazz Fest in 2006, so almost four

17    years ago.  I think that goes a long way towards showing

18    Louisiana.

19          Getting back to, you know, performance in and breach,

11:32 20    we have allegations of a breach of contract but no specific

21    facts that I can discern on what exactly the breach was.  All

22    the gigs, all the engagements, were played.  Proper notice,

23    timely notice, was given of nonrenewal of the agreement.  It

24    was a two-year agreement with, you know, subsequent periods

25    that could be agreed to.

1          And it appears that really this lawsuit in large part

2     is a genesis from the defendants' decision not to continue with

3     the contract, which they had a legal right to do.  So where is

4     the breach?  They played everything.  They did what they were

5     supposed to do.  I'm sure --

6          THE COURT:  Did they pay the commissions and return

7     the advances that allegedly were made by the plaintiffs?

8          MR. PIEKSEN:  That's an interesting question.  If you

9     notice, in the pleadings the plaintiff alleges that all the

11:32 10     money went through their bank accounts.  Defendants didn't get

11     the money.  They got some salary for a while and then that's

12     it.  They don't even have control over their own money.

13          You'll notice that there was an allegation that the

14     defendants netted $650,000.  Well, what's the gross?  We're

15     waiting on an accounting.  That's one of the things -- once we

16     get past the preliminary venue and jurisdiction issues, we're

17     eager to get to the merits.  We're eager to see the accounting.

18     We're eager to see what these expenses are.  What money was

19     spent?  Where?  When?

11:33 20          The contract calls for written approval of all

21     expenses over $2,000 a month.  There is no such written

22     approval, and yet there's an allegation that

23     half-a-million-dollars-plus was spent over three-and-a-half

24     years on a band that was making roughly $100,000 a year.  It

25     doesn't add up.  To answer you on the accounting, we're

1    waiting.  We'd like to see it.

2         To get back into the other aspects of the alleged

3    breaches, there's no breach that the guys didn't do what they

4    were supposed to do, didn't play the music they were supposed

5    to play.

6         And then the performance of the contract, again,

7    95-plus percent of the defendants' obligations under this

8    contract occurred outside Massachusetts.  We sent you a list

9    attached as an exhibit to our reply that had, as best as we can

11:34 10    create, all the engagements, all the performances entered into

11    by the defendants.  And of those 200-some-odd performances,

12    somewhere between four and eight were in Massachusetts.  The

13    rest were elsewhere.

14         THE COURT:  The last I heard, though, when one

15    establishes whether or not there's jurisdiction, I don't have

16    to look at percentages of the time spent outside of the

17    district and in the district.  It's whether or not there were

18    sufficient contacts.  Nobody has told me that that's more or

19    less than 5 percent of the activity of the corporation.  So I

11:35 20    don't -- that doesn't, you know, weigh on whether or not I have

21    jurisdiction over your clients.

22         MR. PIEKSEN:  Well, I would submit to you that it

23    factors in when you look at the substantial nature of the

24    contract -- of the contacts in the forum state, the

25    foreseeability of coming into the forum state.  It was not

1    foreseen -- if this had been a contract to come up and play a

2    gig -- is it Great Woods, Little Woods?  Some venue.  If it was

3    a contract to come up and play House Of Blues, something like

4    that, I wouldn't be making this argument to you because it's

5    clear that the performance of that type of contract would be in

6    Massachusetts.

7         But this contract was not contemplated as a

8    Commonwealth-based contract.  Plaintiff's own pleadings, you

9    know, state that the defendants were virtually in a different

11:36 10   city every day.  They're working, traveling musicians.  They

11   play coast to coast.  They don't play Europe and Japan.  They

12   never have as this group.  We'll table that for now.  But

13   they've -- the point being is that it's minimal the actual

14   in-Massachusetts efforts, you know, by the defendants.  And I

15   think that ties back into standing.

16        THE COURT:  I need you to wrap up, Mr. Pieksen.

17        MR. PIEKSEN:  Sure, sure.  Let me go pretty quickly.

18   Trial efficiency, again, I mean, we understand that it's

19   somewhat of a close call, but we would submit to the Court that

11:36 20   the issuance of subpoenas for getting witnesses to trial,

21   important witnesses, would militate towards Louisiana.

22        Certainly, the cost.  You know, the defendants, like I

23   say, are working musicians.  You can tell from the escrow

24   submissions that Mr. Batiste and Mr. Stoltz do not make much

25   money whatsoever.  Mr. Porter was making a living.  He's having

1    a bit of a struggle now with some of the restrictions on his

2    income that are currently in place.  But, you know, I think

3    when you balance the financial positions, that definitely

4    weighs in favor of the defendants.

5         If I need to wrap up, that's basically it, Judge,

6    unless you have any other questions.

7         THE COURT:  Thank you.  I'll hear from Mr. Baker in

8    that regard.

9         MR. BAKER:  Thank you, Judge.  Unless the Court

11:37 10   advises me otherwise, I'll just respond to his points.  Your

11   Honor, as far as contract formation goes, Attorney David

12   Herlihy to my right is in-house counsel.  He spent months

13   negotiating the agreement.  He had numerous telephone

14   conversations and conferences and the exchange of emails with

15   Attorney Eveline.  A number of different generations of

16   contract went back and forth.

17        Mr. Porter and his wife were in the Commonwealth of

18   Massachusetts in September, at the expense of my client, for

19   approximately five days.  They had daily meetings concerning

11:38 20   negotiations with respect to the formation of the contract.

21   During that same period, your Honor, Mr. Stepanian provided

22   airfare and lodging for Brian Stoltz, one of the other

23   defendants who also participated in the formation of the

24   contract by way of negotiations.

25        In November of 2005, Mr. Porter was artist in

1   residency for a week at Berklee School of Music.  During that

2   entire period of time, Mr. Stepanian had daily meetings with

3   Mr. Porter here in the Commonwealth of Massachusetts about the

4   formation of a management agreement.  All of these terms

5   ultimately formed the basis for an agreement.

6         The mention by my brother from New Orleans with

7   respect to the arbitration clause, it was an arbitration

8   clause.  It wasn't agreed upon.  It was taken out.  Paragraph

9   21 of the agreement, your Honor, makes clear choice of law was

11:39 10   Massachusetts.  And because of the nature of where the

11   defendants were going to be traveling and where the defendants

12   were at the time that all of these discussions occurred, the

13   parties agreed the formation of the agreement would be in

14   Massachusetts.  It's in Paragraph 21.

15         In addition to that, your Honor, the contract was to

16   be deemed performed in Massachusetts for the same reason.  I've

17   submitted to your Honor an affidavit signed by my brother, Mr.

18   Herlihy, which makes clear these terms were contemplated by the

19   defendants.  They didn't rebut them.  They didn't dispute them.

11:39 20   That was the basis for Paragraph 21.

21         I wish to draw the Court's attention to Paragraphs 2

22   and 3 of the agreement.  Paragraph 2, your Honor, makes clear

23   of the precise services that Highsteppin', as the management

24   company, would provide.  It goes through an extremely expansive

25   litany of services that Highsteppin' was going to provide to

1    the defendants.  If you read Paragraph 2 in conjunction, your

2    Honor, with Paragraph 3, which is styled, "Authority of

3    Highsteppin'," I just wish to read to the Court the very first

4    sentence.  "Highsteppin' is hereby irrevocably appointed

5    Artist's exclusive, true and lawful attorney-in-fact, for the

6    full Term, which appointment is hereby deemed a right coupled

7    with an enforceable interest therein, for Artist and in

8    Artist's behalf, to do any of the following."  It gives

9    Paragraph 3 a Roman Numeral 10 explanation of all of the

11:40 10    services that Highsteppin' was going to perform here in the

11    Commonwealth for the benefit and with the express agency

12    approval by the defendants.

13         I wish to draw the Court's attention to a case which

14    the defendants cited called Daynard.  It's a First Circuit

15    Court of Appeals case, your Honor, which says, where an agent

16    is part of the basis for jurisdiction, that can meet the

17    requirements of due process.  Interestingly enough, the

18    defendants never disputed the Long-Arm Statute and whether the

19    plaintiff's arguments comply.  We certainly briefed it to your

11:41 20    Honor.

21         The basis for our jurisdiction is simply not formation

22    of the agreement, but it certainly includes that.  It's the

23    entire three-and-a-half-year performance by Highsteppin' with

24    the express authorization and at the direction of the

25    defendants.  I'm not going to burden the Court with the myriad

1    things they did, but on a daily basis -- and it's in the

2    papers.  It's in Mr. Stepanian's affidavit, Mr. Herlihy's

3    affidavit and three other affidavits from independent

4    contractors and employees.  On a daily basis they checked with

5    the venues.  They received payments here in the Commonwealth of

6    Massachusetts.  They paid for the hotel.  They paid for the

7    bus.  They paid for the car.  They paid for the flight.  They

8    had scores of emails back and forth every day from Mr. Batiste,

9    Mr. Stoltz and Mr. Porter as to any logistical need whatsoever

11:42 10   they had.

11           In addition, here in the Commonwealth, we were in

12   charge of and we complied with replication of CDs.  We'd take a

13   master.  We would multiproduce it and distribute it.  We were

14   in charge of their e-commerce.  We developed web pages here in

15   the Commonwealth, and we maintained them for each of the

16   defendants.  We increased their email lists from 300 to 10,000.

17   If Mr. Porter's fan asked Mr. Porter for a signed photograph of

18   Mr. Porter, he would instruct somebody from Highsteppin' --

19   they would put the stamp on the envelope and put the picture in

11:42 20   the mail.  The level of participation on behalf of

21   Highsteppin', I submit to your Honor, with respect to the work

22   that we did for the defendants, with their knowledge, with

23   their express assent, consent, and for their benefit, is

24   expansive.

25           Mr. Pieksen says I don't really understand what this

1   dispute is about.  Attached to our amended complaint and to our

2   original complaint, your Honor, is our accounting which

3   identifies $527,000 person by person of the three putative

4   defendants and how much each of them owes and for what purpose.

5         In addition to that, when I submitted to your Honor --

6   or to this court, I should say, excuse me -- our motion for a

7   preliminary injunction, Mr. Stepanian signed an affidavit.

8   Again, there was that same accounting person by person, amount

9   and breakdown of the monies that were owed.

11:43 10         Mr. Pieksen raises an interesting point which I just

11   wish to address to the Court because I don't think it's really

12   part of today's hearing.  But that is, where did the money go?

13   The defendants constantly asked us and we provided to them,

14   because we had an interest in a larger picture, a bigger

15   business enterprise, loan advances and monies so that they

16   could fund their lifestyles in whatever manner that they

17   wanted, and seldom did Mr. Stepanian ever turn them down.

18         The monies that we were entitled to, they wanted to

19   reinvest in the business and we agreed at the time.  And that's

11:44 20   why there is this substantial amount of money, which could very

21   well have not been a bigger issue if the defendants had not

22   chosen to pull out of this agreement.  So that is, your Honor,

23   why I suggest that --

24         THE COURT:  You've talked about jurisdiction.  Talk a

25   couple of minutes about venue.

1          MR. BAKER:  Your Honor, with respect to the witnesses

2     we have identified, these are -- the case law says it's not

3     simply the number.  It's the quality of witnesses.  These are

4     people -- if you look at Mr. Stepanian's affidavit, Mr.

5     Herlihy, Miss Dyer and the other two persons, these witnesses

6     all go to the very heart of contract performance, what we did

7     here in the Commonwealth of Massachusetts with respect to

8     managing their business, paying their bills, answering their

9     daily calls and everything.

11:44 10          I've only put in Mr. Stepanian's affidavit 32

11    identified witnesses because I didn't want to overwhelm the

12    Court.  I have a list of the other 50-some-odd witnesses.  I

13    think those 32 witnesses, who are all local, who are all

14    capable of testifying about the core issue, which is, how is

15    Mr. Stepanian's business -- how did it perform with respect to

16    the contract that it entered into with the defendants?  The

17    defendants cited that it's easy.  Did they pay?  No, they

18    didn't.  That is our allegation.  Did we perform?  We did all

19    of these services.  We provided ongoing business foundation for

11:45 20    their needs while they were traveling around the world.  Thank

21    you, your Honor.

22          THE COURT:  All right.  Mr. Pieksen, do you want one

23    minute of rebuttal?

24          MR. PIEKSEN:  I'll take it, sir.

25          THE COURT:  Okay.  You can stay there if you'd like.

1          MR. PIEKSEN:  Thank you.  Real briefly, first of all,

2     it's not the plaintiff's activities in the forum state that

3     matter.  It's the defendant's.  I mean, the case law is clear.

4     So I'd like to make that.  Nobody disputes that the plaintiff

5     is based here and the plaintiff did what the plaintiff did in

6     Massachusetts.  It's what the defendants did or did not do in

7     Massachusetts.  So I'd like to make that point.

8          The accounting, we saw.  It's really a nonissue for

9     today, although we would indicate it's woefully inadequate.  It

11:46 10     doesn't really answer the questions.

11          As far as reinvesting in the business, whose business?

12     The money wasn't reinvested in PBS or the three individual

13     defendants.  I'd like to point that out.

14          As far as Mr. Porter and Mr. Stoltz being in Boston,

15     the question really is, you know -- Number 1, that was before

16     the contract, almost a year before the contract.  Number 2, it

17     was never presented that way.  What was presented was Katrina

18     hit.  Everybody got wiped out.  And, you know, quite frankly,

19     Mr. Porter and his wife thought that they -- it was a friend

11:46 20     who was helping them out in a time of need, not somebody who

21     would come back as a wolf in sheep's clothing and say, I helped

22     you out when you were down and now we have jurisdiction over

23     you.  It's irrelevant, quite frankly.  It was before the

24     contract.  There were no week-long meetings for contract

25     formation.

1          Quite frankly, I would suggest if the Court needs to

2     hear more on this, perhaps we could do a videoconference with

3     some witnesses if the Court has further questions in the future

4     to facilitate, or we'll come back up here if we need to.  But I

5     would just like to point that out, that any largesse that was

6     given to Mr. Porter or Mr. Stoltz was not given under the guise

7     of, hey, this is part of a contract and a business arrangement.

8     It's more like, jeez, you guys had a real bad turn of events

9     down there.  We'll try and help you out.  Any questions, your

11:47 10     Honor?

11          THE COURT:  No.  Thank you.  Thank you, Mr. Pieksen.

12     These arguments are, as usual, never all one side and not on

13     the other.  But I have sufficient evidence to decide this

14     motion, and I am going to deny the motion to dismiss for lack

15     of personal jurisdiction, and I am going to deny the motion to

16     transfer venue.  So the case is going to stay in this session.

17          And I now have before me a motion for contempt, but I

18     would ask you, Mr. Baker, to address that motion in light of

19     the filings that have been made by the defendants since the

11:48 20     filing of that motion.  It does seem to me that a good-faith

21     effort has been made on behalf of the defendants to explain to

22     me the lack of immediate response; that is, it took apparently

23     two-and-a-half months after my entry of the preliminary

24     injunction, but, in fact, there has been a submission that

25     tries to explain to me what money was received by the

1    defendants and where it is and what amount has been put aside.

2         How does that change your motion to me to hold the

3    defendants in contempt?

4         MR. BAKER:  Your Honor, I just received this morning,

5    just to be clear, a supplement by Mr. Penton, so I don't really

6    know exactly what they've said.  But I do have the benefit of a

7    submission which Mr. Penton made approximately a week ago, so

8    I'm working off of that one.  I just want to be clear with the

9    Court.

11:49 10        Your Honor's order said performance fees shall be paid

11   into escrow.  And perhaps your Honor may recall, but if not,

12   let me refresh the Court's memory, please.  Mr. Penton and I

13   had a number of discussions in January about restraining monies

14   at least until he could, to use his repeated statements, get

15   his hawks in, which I construed to mean to file his appearances

16   and get approved and all of that.  Fine.  He sent me a letter,

17   and I presented it to the Court and the Court said fine.  Let's

18   file this.

19        The order that you entered states that the performance

11:49 20   fees shall be escrowed.  They shall be identified to me within

21   ten days of the defendants knowing about them.  For instance,

22   the defendants are alerted that they're going to have a gig.

23   It's going to be a $5,000 fee.  Ten days later Mr. Penton says,

24   Mr. Baker, your $5,000 is coming in, of which Mr. Porter gets

25   $3,000.  What I'm having a problem with, your Honor, is the

1    amount that we're owed is approximately $550,000.

2         The defendants have created their own accounting

3    system.  Your order says place the fees in escrow.  We chose

4    Mr. Penton because that's what he wanted.  I presented the

5    letter to your Honor and your Honor accepted.  It doesn't say

6    deduct what you consider to be reasonable expenses or necessary

7    expenses or direct expenses and then, after that, take what's

8    left and calculate 20 percent and put that in escrow or exempt

9    in its entirety some of those fees, which is what they've done.

11:50 10       We have an idea of how much money is going to be paid

11   through May 31st.  I cite May 31st as a date, your Honor,

12   because the New Orleans Jazz Fest is happening in about two

13   weeks, I believe.

14         MR. PIEKSEN:  Two days.

15         MR. BAKER:  Two days, as my brother advises.  And

16   substantial revenues are going to be generated by the

17   defendants.  Your order is clear.  The fees will be paid into

18   escrow within ten days of identification.  I don't really care

19   that they were late.  I spoke to Mr. Penton in February.  He

11:51 20  said I was going to have it in two days.  I waited another

21   month and a half and filed my motion.

22         What I care about, Judge, is that Mr. Stepanian's

23   affidavit shows he believes it's somewhere in the neighborhood

24   of $200,000 will be grossed by these defendants through May

25   31st.  They have filed an accounting with the Court that shows

1   $4,000 or $5,000 paid, and we believe at least half of that

2   money has been generated through to today.  What I find myself

3   subjected --

4        THE COURT:  I'm sorry.  They say how much is going to

5   -- 400,000, did you say?

6        MR. BAKER:  No, sir.  What I said was, we believe

7   through the filing of the complaint for contempt, which is, I

8   think, April 12th, with the Court, Mr. Stepanian and I worked

9   carefully on an affidavit for a number of days trying to figure

11:52 10   it out.  I asked Mr. Stepanian, who's still in the business and

11   still in the music industry, what he believed these defendants

12   would generate, and he's certainly qualified to do that because

13   he represented them for four years.  And he told me, from the

14   date of the orders, your Honor's orders, through April 13th, I

15   believe that they have grossed $100,000 in performance fees,

16   obviously plus or minus.  And that's based on the Court's

17   definition.

18        From April 13th to the end of May, because there's

19   going to be a lot of activity, as Mr. Pieksen points out, in a

11:52 20   couple of days, excuse me, we believe through the end of May,

21   these defendants are going to gross another $100,000.  What I'm

22   having a problem with, and I think that the defendants --

23   although they made a "good-faith attempt" to comply with the

24   Court's order, what I'm having difficulty with is the Court

25   order said put the performance fees in escrow, not 20 percent

1   of the net fees after you take expenses.  And at the rate that

2   we're going, unless Mr. Penton can come up with some other

3   idea, the monies will be secured in some way, shape or form in

4   the year 2025.  Thank you, your Honor.

5          THE COURT:  Before you sit down, Mr. Baker, and

6   notwithstanding the fact that the injunction says what you say

7   it says, that is, to put all of the funds received into escrow,

8   what was the intent -- what was the understanding of the

9   parties back in January as to how the defendants were going to

11:53 10   live in the meantime?  If they were going to put 100 percent of

11   their receipts into escrow, how were they going to survive?

12          MR. BAKER:  It's a valid question, absolutely.  I

13   don't know the answer to that because Mr. Penton and I had a

14   couple of phone conversations, and I said, This is what I'm

15   looking for.  Keep in mind, your Honor, for three-and-a-half

16   years we paid all their living expenses and everything.  The

17   monies from the performance came in, and we didn't get to

18   collect any of that.  I think if you look over the aggregate

19   period it's not unreasonable for us to say that.

11:54 20          Now, to answer your Honor's question, I don't know the

21   answer to that in all fairness to the Court and certainly to

22   the defendants.  But that's not what the court order says.  At

23   the rate we're going, it's just never going to amount to

24   anything significant.

25          THE COURT:  What about the provision that 30 percent

1    of the fees received in connection with publishing rights --

2            MR. BAKER:  That was specifically requested by Mr.

3    Penton, not the 30 percent.  If your Honor goes back and looks

4    at the January 19, 2010, letter, which your Honor ordered that

5    I file with the Court -- I submitted it with the injunction

6    proposed order that I gave to your Honor -- Mr. Penton said, I

7    don't want you to take all of the publishing rights, if that's

8    what it says, the 30 percent.  I said fine and I submitted the

9    letter to your Honor.  And I put in the proposed order which

11:55 10   your Honor then considered and signed.  Thirty percent will go

11   to the defendants because I was --

12           THE COURT:  And that will amount to what?

13           MR. BAKER:  I don't know, your Honor.  It was my

14   understanding that that would be a significant amount.  I can't

15   tell you what the dollar amount is because none of these

16   reach-and-apply defendants seem to want to account.

17           THE COURT:  How does it compare with the projected

18   receipts that your client believes he's going to receive?

19   (Discussion held off the record.)

11:55 20          MR. BAKER:  I am informed by my co-counsel that it

21   varies based on the record sales and things of that nature, and

22   I don't know the answer to that.  In my conversations with

23   Penton at the time I was -- I believed that that would be a

24   sufficient amount, 30 percent of the publishing rights,

25   certainly for Mr. Porter who's got, as Mr. Penton's papers

1  indicate, 40 years of history in the music business and a

2  substantial worldwide reputation in that regard.

3         THE COURT:  All right.  Thank you.  Mr. Penton.

4         MR. PENTON:  Yes, your Honor, may it please the Court.

5  Ronnie Penton.  Let me say that I know this Court doesn't know

6  me.  I have practiced law in these federal courts in the United

7  States for 30 years.  I was a professional musician for 20

8  years.  So I bring to my analysis of the Court's order the

9  industry experience as well as the legal experience.

11:56 10        And I'm here personally to tell you that in my 30

11  years I've never been held in contempt by a court in any state.

12  I've never had a client held in contempt.  And if the Court in

13  its good reasoning feels that this was contemptuous, I would

14  ask that I be allowed to fall on the sword here and take that

15  responsibility because it was my experience that looked at this

16  order.

17        And I need to explain to the Court why we did the

18  accounting we did.  From the time on December 30th that the

19  temporary restraining order was first filed by Highsteppin',

11:57 20  the term "fees" were used.  And it was perpetuated through an

21  amended temporary restraining order.  It was perpetuated in a

22  request for a preliminary injunction, and it was perpetuated in

23  the order for preliminary injunction where the TRO was

24  converted.

25        Judge, I wrote a letter because we were just retained.

1      We couldn't get here.  And the Court was very gracious in

2      allowing us -- in fact, Jeffrey even submitted my letter, which

3      I did appreciate he did that.

4          Judge, the problem we have here, the Court sees it.

5      The fact is, is that these artists have really two types of

6      income that they receive.  These particular artists may produce

7      a venue themselves where they put together three or four or

8      four or five side men or musicians to come with them to play a

9      show.  As a part of that show, they have travel expenses.  They

11:58 10  may have equipment rental expenses.  They even may have booking

11      agency expenses that they have to pay.

12          So at the end of that show -- let's just say that

13      they're given an offer of $2,500 for a two-hour show.  Well,

14      they have to pay all these folks.  There is no way that -- if

15      you define "fees" as has been perpetuated in these orders,

16      there is no way they could turn over $2,500 in a self-produced

17      show because they have all these expenses to pay.

18          Now, the other type of income they receive, if they

19      are a side man -- if the Court would take a look at the

11:58 20  spreadsheets, you'll see that in many instances they are side

21      men.  In other words, they're paid for the show.  They're paid

22      by someone else a flat fee, $100, $250, and maybe even

23      sometimes more.

24          The fact is, Judge, if these musicians were required

25      to pay and define fees as 100 percent of gross receipts, they

1    wouldn't work.  They couldn't work because they couldn't go do

2    that show and pay 100 percent of that.

3           Now, Judge, when we were trying to determine the

4    identification of fees, we went to great pains.  And the Court

5    would see in the spreadsheets, we disclosed it all; in other

6    words, all the expenses, all of the percentages due to someone

7    else, in a spreadsheet form, for this kind of forum here that

8    we're in, that we can work these things out.  We were not

9    intentionally trying to be contemptuous.  We have all the

11:59 10   information on every one of those shows there.

11          We're prepared to sit down, even in an amended

12   preliminary injunction order, in order to hammer out what

13   "fees" mean.  Does it mean gross receipts?  Does it mean net

14   receipts?  What does it mean?  And get together a reporting

15   period as well as a disclosure of all expenses or all

16   percentages or whatever.

17          We looked at the 30 percent of the publishing.  I made

18   a comment in the January 19th letter, at least on the

19   publishing that preexisted the relationship with Highsteppin',

12:00 20   you know, please don't take everything they have.  Now, Judge,

21   what's interesting, none of these publishers will pay a penny.

22   Every one of the defendants' publishers have said, No, guys.

23   Our policy is we're withholding all publishing royalty until

24   such --

25          THE COURT:  Withholding all?  I didn't hear it.

1    You're withholding all?

2         MR. PENTON:  Yes, sir.  The publishing companies are

3    withholding 100 percent of all publishing royalty until these

4    issues -- legal issues are resolved.  Now, there were

5    publishing companies that were served with these injunctions,

6    and so it matters not that there's 30 percent that was written

7    into here.  They're receiving zero percent of publishing

8    royalties.

9         But, Judge, I would just say that this is our first

12:01 10   time before you.  If you feel that my analysis of fees and

11   really looking at the total reality of it -- what we did when

12   we looked at the 30 percent, we tried to capture the 20 percent

13   that was due to Highsteppin'.  We tried to itemize all the

14   gross expenses in a show so that if the Court required us to

15   make a higher deposit, we're prepared to do that, Judge.

16        I just would say one thing about it.  What we learned

17   in the ten-day rule that was written into it, it was hard to

18   get the first things together because we were in a

19   reconstruction mode.  Your order said "not yet payable" if

12:01 20   you'll remember reading that.  We went back -- that would have

21   been January 26th.  We went back to the show here in Boston at

22   the House Of Blues that they played for the -- the Meters

23   played for the National Hockey League.

24        And we picked that up, too, in a good-faith effort to

25   bring that money forward because Mr. Baker had tried to serve

1    subpoenas, I believe, on certain parties in order to sequester

2    that money where the Meters played.  That was just Mr. Porter

3    and Mr. Batiste.  Mr. Stoltz didn't play that Meters job here

4    in Boston for New Year's Eve.

5         But, Judge, we made the decision to go back to when

6    the original suit was filed and recapture those dollars, and we

7    did that in order to be in good faith with this Court.  So

8    that's my plea to your Honor.  I would ask that -- even to

9    counsel I asked, Give me a break.  I did the best I could to

12:02 10   make a good-faith showing.  We are prepared to modify our

11   reporting in any manner.

12         THE COURT:  All right.  I think I've heard sufficient,

13   Mr. Penton, and I do appreciate your explanation.  It was not

14   the intent of the Court, nor do I believe it was the intent of

15   the plaintiff, to ask for the escrowing of funds before the

16   netting out of expenses that are necessary to gain the gross in

17   the first place.  In other words, if your clients, when they

18   make a performance, get a net -- or a gross of -- pick a number

19   out of the air -- 50,000, and it costs them $30,000 to get that

12:03 20   $50,000, nobody, at least realistically, can ask them to submit

21   the 50 and not pay their vendors the 30 to make the 50.

22         But having said that, it is certainly, and was, the

23   intent of this Court to require the escrowing of more than what

24   was due just going forward as though the contract had not been

25   breached because I am dealing with an allegation that I found

1    to be, at the stage of the preliminary injunction, a likely

2    winning one.  That's the standard under which the plaintiff had

3    to prove to get me to enter a preliminary injunction, a

4    likelihood of success on the merits of their claim.  They claim

5    that your clients owe them roughly $500,000.  So they are

6    entitled to have escrowed more than just what would have been

7    going forward with the contract in the first place, which is,

8    as I understand it, the 20 percent.

9         MR. PENTON:  Yes, sir.

12:04 10         THE COURT:  So somewhere between 20 and 100 percent is

11   an appropriate amount to have been escrowed from the gross

12   receipts of your client, more than 20 if -- albeit, less than

13   100.  That's a number that I have no knowledge of being able to

14   determine, but you folks very well should.  And I'm going to

15   require you to sit here, because I don't have anything more in

16   this courtroom at least until in the middle of the afternoon,

17   and negotiate this out as to something that is going to be

18   satisfactory to both sides going forward, understanding that

19   what we're trying to do here is to provide the plaintiffs with

12:05 20   some security if and when they are able to prove their case in

21   court.

22         They haven't proved it yet.  They've only argued for a

23   preliminary injunction.  I was convinced that they were

24   entitled to a preliminary injunction, and I remain convinced

25   that they are.  But it's up to you folks to determine exactly

1     what that means and the accounting that is necessary that can

2     put Mr. Baker and his folks on his side in some sort of comfort

3     zone as to knowing that they have got a fund available from

4     which to argue at the end of the day.  That's what we're going

5     to do here.

6                Any problem with that, Mr. Baker?

7                MR. BAKER:  None whatsoever, your Honor.  That sounds

8     reasonable.

9                THE COURT:  All right.  Why don't you then remain --

12:06 10     you can sit here.  We do have a little anteroom out there if

11     you'd prefer to be outside of the courtroom.  But you can use

12     this courtroom if you'd like to try to turn the tables around,

13     face each other and see if you can't resolve this issue as

14     we're going to go forward because now we are going to go

15     forward in this case.

16                The next thing is we're going to have a scheduling

17     conference here sooner rather than later because this case has

18     now got some teeth on it.  It's what?, three or four months

19     old.  We should get to the point of having a scheduling order,

12:06 20     and that -- my deputy will submit to you, if not today, a form

21     that will inform you how to respond.  And, basically, it's

22     getting together and deciding what you think is a fair

23     scheduling order, and then I'll determine whether I think it's

24     fair.

25                If necessary, we'll have another conference.  I don't

1   mean to drag people back from Louisiana for such a thing.  I've

2   certainly in other cases allowed counsel to appear by telephone

3   for scheduling conferences, so that can be done.  This is

4   something that counsel ought to sit here today and resolve how

5   we're going to get from A to B.

6          And I am disinclined at this stage to enter an order

7   of contempt.  I don't think that you acted deliberately

8   contemptuously, Mr. Penton.  I believe that you have been

9   acting in good faith, and I expect that as an officer of this

12:07 10   court, as you are, as is plaintiff's counsel, you will proceed

11   to resolve this issue.

12          Anything else then that needs to come to my attention

13   at this stage?

14          MR. BAKER:  Not from the plaintiff's side, your Honor.

15          THE COURT:  Mr. Penton?

16          MR. PENTON:  None, your Honor.

17          THE COURT:  And Mr. Pieksen?

18          MR. PIEKSEN:  No, sir.

19          THE COURT:  All right.  Thank you, counsel.  Good

12:08 20   luck.

21   (Whereupon, at 12:08 p.m. the hearing concluded.)

22

23

24

25

1                        C E R T I F I C A T E

2

3

4             I certify that the foregoing is a correct transcript

5        of the record of proceedings in the above-entitled matter to

6        the best of my skill and ability.

7

8

9

10

11

12        /s/Cheryl Dahlstrom              04/30/3010

13        Cheryl Dahlstrom, RMR, CRR       Dated

14        Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25